IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID **Rachel.Diolosa.3 100004674425268** THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 5:20mj00013 <br> **FILED UNDER SEAL** |

**FILED UNDER SEAL**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, William Seth Foster, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703 (a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), and have been since December 19, 2018. Prior to joining DEA as a TFO, I was assigned to the Criminal Investigations Division of the Frederick County, VA Sheriff's Office from May 2018 until December 2018. From April 2013 until May 2018 I was assigned to the Northwest Virginia Regional Drug Task Force. Prior to my Narcotics experience, I was

assigned to the Patrol Division with the Frederick County Sheriff's Office from December 2007 until April 2013. Prior to Frederick County Sheriff's Office, I was employed by Front Royal Police Department in Front Royal, VA from June 2006 until December 2007 and was assigned to the Patrol Division. I am currently assigned as a TFO to the Winchester Resident Office of the Washington Field Division Office, located in Washington D.C.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841(a)(1) have been committed by Rachel LAIRD, AKA, Rachel DIOLOSA. There is also probable cause to search the information described in Attachment A for evidence of these crimes (and contraband or fruits of these crimes) as described in Attachment B.

## PROBABLE CAUSE

5. On December 4, 2019, Ashley JOBE-RICKARD overdosed on suspected heroin and was ultimately arrested. Inv. Eric Varnau (Frederick County, VA Sheriff's Office / Northwest Virginia Regional Drug Task Force) was investigating the overdose. On December 12, 2019, TFO Seth Foster and Frederick County, VA Sheriff's Office Investigator Eric Varnau, met with Ashley JOBE-RICKARD at the Northwestern Regional Adult Detention Center for the purposes of an interview / follow-up on her overdose from December 4, 2019.

6. TFO Foster advised JOBE-RICKARD that he wanted to speak with her regarding her overdose. JOBE-RICKARD stated that she understood. TFO Foster asked JOBE-RICKARD who provided her with the heroin that caused her overdose. JOBE-RICKARD advised TFO Foster that "Rachel" provided her the heroin. TFO Foster showed JOBE-RICKARD a photograph of Rachel LAIRD and asked if she knew the female. JOBE-RICKARD advised TFO Foster that she knew the female and stated that it was Rachel DIOLOSA. TFO Foster knew Rachel LAIRD'S maiden name to be

   DIOLOSA. JOBE-RICKARD advised TFO Foster and Inv. Varnau that she has known LAIRD for 10 years. JOBE-RICKARD stated that on the day of her overdose she had been feeling "shitty" due to recently being accused of relapsing while living at an Oxford House in Winchester. JOBE-RICKARD advised TFO Foster that LAIRD had been "Facebooking" her in the days leading up to her overdose. JOBE-RICKARD stated that she had been trying to avoid LAIRD because she could tell LAIRD had been using heroin. JOBE-RICKARD stated that she was feeling depressed so she decided to contact LAIRD. JOBE-RICKARD stated that she contacted LAIRD and asked her where she was. JOBE-RICKARD stated that LAIRD told her she was in Hagerstown. JOBE-RICKARD stated that she told LAIRD to call her when she was back in town.

7. JOBE-RICKARD stated that LAIRD sent her a Facebook Message stating that she was back in town. JOBE-RICKARD advised TFO Foster that she told LAIRD she needed to ask her something. JOBE-RICKARD stated that she asked LAIRD "what's good." TFO Foster knows "what's good" to be slang and/or a street term for asking someone if they have drugs for sale. JOBE-RICKARD stated that LAIRD asked her if she wanted to go up or down. TFO Foster knows from his training and experience that "up" is a slang term for referring to drugs that are stimulants, such as cocaine. TFO Foster also knows that the term "down" is a slang term for referring to drugs that are depressants, such as heroin. JOBE-RICKARD advised TFO Foster that she took this to mean LAIRD was asking her if she wanted cocaine or heroin. JOBE-RICKARD stated that she told LAIRD that she thought she wanted to downtown, referring to heroin.

8. JOBE-RICKARD stated that LAIRD asked her where she was at. JOBE-RICKARD stated that she told LAIRD she was on Valley Avenue. JOBE-RICKARD advised TFO Foster that LAIRD picked her up just down the street from the McDonald's by Handley High School. JOBE-RICKARD stated that she got into the back seat of LAIRD'S vehicle. JOBE-RICKARD stated that LAIRD told her they had to travel to Martin's Grocery to get the heroin. JOBE-RICKARD stated that they traveled to the Martin's Grocery on Pleasant Valley Road in the City of Winchester. JOBE-RICKARD stated that LAIRD exited the vehicle and she waited in the car.

9. JOBE-RICKARD stated that when LAIRD got back into the car, she gave her a pack of heroin. JOBE-RICKARD stated that she had already given LAIRD $40 for the heroin

prior to LAIRD exiting the car. JOBE-RICKARD stated that LAIRD told her to be careful. JOBE-RICKARD stated that she could tell by looking at and smelling the heroin that it was good heroin. JOBE-RICKARD stated that the heroin was wrapped up in a Martin's Grocery receipt.

10. JOBE-RICKARD stated that LAIRD then took her back to her (JOBE-RICKARD'S) hotel room and dropped her off. JOBE-RICKARD stated that she went into her hotel room and was nervous because it had been a while since she used heroin. JOBE-RICKARD stated that she had been clean for about 15 months. JOBE-RICKARD stated that she put a little bit of the heroin on a table and snorted it. JOBE-RICKARD stated that it didn't take her long to realize the heroin was good. JOBE-RICKARD stated that she waited an hour or so and then used a little more of the heroin.

11. JOBE-RICKARD stated that when her boyfriend fell asleep, she got up and went into the bathroom and sniffed some heroin straight from the pack. JOBE-RICKARD stated that she knew she had done too much. JOBE-RICKARD stated that the last thing she remembers was taking her clothes off and getting into bed.

12. JOBE-RICKARD stated that prior to her overdosing, but after she had already used some of the heroin, she remembered talking to LAIRD and saying something to the effect of "ew wee," referring to how good the heroin was. JOBE-RICKARD stated that she has not talked to LAIRD since her overdose.

13. JOBE-RICKARD advised TFO Foster that most of her conversations with LAIRD were done via Facebook Messenger. JOBE-RICKARD stated that she deleted her Facebook Messages off of her phone because she didn't want her boyfriend to find them.

14. On December 24, 2019, Rachel LAIRD was arrested for possession with the intent to distribute heroin. As a result of this arrest, two cell phones were seized that belonged to her. Investigator Avery Kenney (Frederick County, VA Sheriff's Office / Northwest Virginia Regional Drug Task Force) obtained and executed a search warrant for both of LAIRD'S cell phones. On February 10, 2020, TFO Foster and Lt. Covert removed the cell phones from the Frederick County, VA Sheriff's Office evidence room so TFO Foster could try to view any Facebook Messenger messages on the phones. TFO Foster began by looking at the Samsung Galaxy Note 10. TFO Foster turned the cell phone on and then opened up Facebook Messenger. TFO Foster saw numerous conversations

between LAIRD and other individuals. TFO Foster scrolled down until he found the conversation between LAIRD and "Ashley Nicole Jobe." TFO Foster knows that JOBE-RICKARD'S middle name is Nicole. JOBE-RICKARD'S picture was also to the left of the conversation thread. TFO Foster opened the thread and began viewing the conversation.

15. TFO Foster saw a part of the conversation that was under "WED AT 1:29 PM." JOBE-RICKARD'S overdose occurred Wednesday, December 4, 2019. The conversation went as follows:

**JOBE-RICKARD:** "What's up girl."
**LAIRD:** "Heyyy."
**JOBE-RICKARD**: "how are you?"

"You busy?"

"I'm trying to get with you and talk"

"Ummm…??? Hello…."

**LAIRD**: "I'm not in town at the moment are you doing tonight I might be free"

"What do you wanna talk about baby"

**JOBE-RICKARD**: "Hell if I know lol"

**LAIRD**: "Lol just need someone mmmnnnnnnnmmmm"

**JOBE-RICKARD**: " Huh?? Lol no I'm trying to ask you something hoofy5"

"Goofy*"

**LAIRD**: "Call me"

JOBE-RICKARD then has a missed Facebook messenger call from LAIRD (2:35 pm)

**LAIRD**: "Call me"

JOBE-RICKARD then has a missed Facebook messenger call from LAIRD (2:36 pm)

**LAIRD**: "Hoee?"

JOBE-RICKARD then has a missed Facebook messenger call from LAIRD (2:36 pm)

**JOBE-RICKARD**: "Wya"

**LAIRD**: "Call me"

There was then a 1 minute 9 second video chat between LAIRD and JOBE-RICKARD at 2:38 pm.

LAIRD and JOBE-RICKARD then text back and forth via Facebook Messenger about an individual. The conversation then picks up at follows:

**JOBE-RICKARD**: "So where's it at?"

"Lol"

**LAIRD**: "Picking up my brother I'm about to come back love."

"What was your mF QUESTION you know I hateeeee thtt."

**JOBE-RICKARD**: "I asked. What's goodie? Lol"

**LAIRD**: "Like wht…honey? Sweets? Or downtown tonight?"

**JOBE-RICKARD**: "…..either is fine lol"

**LAIRD**: "Ashley"

**JOBE-RICKARD**: "Probably downside tho."

**LAIRD**: "Both?"

**JOBE-RICKARD**: "No…don't wanna bye off too much lol"

"Byte*"

**LAIRD**: "How much bread you got boo"

**JOBE-RICKARD**: "A fish"

**LAIRD**: gave a thumbs up

**JOBE-RICKARD**: "I'm not trying to deal with a bunch of people and shit. You already know."

"How long?"

**LAIRD**: "Wya"

**JOBE-RICHARD**: "Win"

**LAIRD**: "No shit me too."

**JOBE-RICKARD**: "Call my phone 5509314250"

**LAIRD**: gave a thumbs up

"Where u wanna meet I'm in town

LAIRD then called JOBE-RICKARD via Facebook messenger (3:16 pm)

JOBE-RICKARD then called LAIRD via Facebook messenger (1 min 0 secs at 3:17 pm)

**JOBE-RICKARD**: "1224 Valley ave"

"You get it?"

JOBE-RICKARD then called LAIRD via Facebook messenger (6 secs at 3:26 pm)

JOBE-RICKARD then called LAIRD via Facebook messenger (49 secs at 3:28 pm)

JOBE-RICKARD then called LAIRD via Facebook messenger (31 secs at 3:33 pm)

**JOBE-RICKARD**: "Oooooo weeeeee."

LAIRED then missed a video chat with JOBE-RICKARD (6:07 pm)

**JOBE-RICKARD**: "Hey girl. Need to holler at you real quick, don't have the new number tho…"

**JOBE-RICKARD**: "ok then.  Lol be careful and hit me later or something.  I was gonna try to do something for my girl but my man's getting ready to be here and I can't do anything or make any moves when get gets in town. Love you girl."

LAIRED then called JOBE-RICKARD via Facebook messenger (12 mins 3 secs at 10:06 pm)

16. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook users can establish accounts with Facebook, and after doing so, can use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

17. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

18. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook then assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for the purpose of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

19.  Facebook users can select different levels of privacy for the communication and information associated with their Facebook accounts.  By adjusting these privacy

settings, a Facebook user can make information available only to himself or herself, to particular Facebook "Friends," or to the general public. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

20. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other upcoming "events," such as social occasions, by listing the event's time, locations, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A Facebook user's profile page also includes a "wall" which is a space where the user and his or her "friends' can post messages, attachments, and links that will typically be visible to anyone who can view their profile.

21. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

22. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

23. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.
24. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.
25. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.
26. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.
27. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.
28. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.
29. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.
30. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their

accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

31. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

32. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

33. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate the items described in Section II of Attachment B.

## CONCLUSION

34. Based on the foregoing, I request that the Court issue the proposed search warrant.

35. Pursuant to 18 U.S.C. § 2703(g), the presence of law enforcement is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will the compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

36. This Court has jurisdiction to issue the requested warrant because it is "a Court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated.

Respectfully submitted,

/s/ William Seth Foster
William Seth Foster
Task Force Officer
Drug Enforcement Administration

Received by reliable electronic means

and sworn and attested to by telephone on

__February 27_____, 2020

_____
The Honorable Joel Hoppe
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to be searched

This warrant applies to information associated with the Facebook user ID **Rachel.Diolosa.3 (100004674425268)** that is stored a premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular things to be seized

I. Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities from June 1, 2019 until February 11, 2020.

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from June 1, 2019 until February 11, 2020 including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f) All other records and contents of communications and messages made or received by the user from June 1, 2019 until February 11, 2020 including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) All information about the Facebook pages that the account is or was a "fan" of;

(k) All past and present lists of friends created by the account;

(l) All records of Facebook searches performed by the account from June 1, 2019 until February 11, 2020

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

(o) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) involving Rachel DIOLOSA (aka Rachel LAIRD) since June 1, 2019 including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The receipt and/or distribution of controlled substances;

(b) Records and information relating to the ordering, purchase or possession of controlled substances;

(c) Records and information evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money or other assets including, but not limited to, firearms and/or controlled substances;

(d) Photographs of firearms and/or controlled substances and photographs of individuals possessing firearms and/or controlled substances and photographs showing the association of individuals;

(e) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(f) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation; and,

(g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).